Our next appeals for this morning are United States v. Jonathan Eymann and United States v. Gary Lyons, 1990 and 1921-01. So, Mr. Hillis. May it please the Court, Counsel. My name is Daniel Hillis, along with Gareth Morris. We represent the defendants. I'm going to talk about some things collectively that pertain to both of us, but I will begin by asking the Court if it has questions about the reasonable expectation of privacy that my client was found not to have in either the car or the plane. If the Court doesn't have questions, I'll rely on my pronouns. Questions? No. I mean, it seems to me that if you're a passenger in this instance, the law seems pretty clear that you don't. Have standing, Your Honor? Have a reasonable – I don't like the terminology standing, but have a reasonable expectation of privacy. I don't mean to fall on bad habits, but standing is often used as shorthand. If I say the term, it's only because of that. So the law is not emphatic on that, Your Honor. There's a multi-factor test that is applied in Carlyle that we're supposed to look at, and it does not say that a passenger's status and determination that he is a passenger as opposed to the driver means that he doesn't have a reasonable expectation of privacy. So I had one random question about this. Maybe you have at the tip of your fingers the answer. So here we have Mr. Imons in the airplane, the Cessna for lots of hours, and he's also in the loaner car, whatever you want to call it, the courtesy car that they keep at the airport. And the courtesy car reminded me actually less of a rental car and more of a taxicab. So I wanted to know if people sitting in a taxicab who may be – I was envisioning myself in New York desperately trying to throw my suitcase into the backseat of the car along with myself before they drew off. So is there a reasonable expectation for that taxicab passenger? Yes, because so long as you've got what you would call the limited possessory interest by virtue of the fare that you pay, you have an expectation of privacy. I don't think society would be prepared for police or bystanders to come in and pull you out of the vehicle and you're free to their rummagings around. And furthermore, I don't think that it's an apt comparator to say that it's a taxi or that it's a rental car. Here it's like a loaner that you would give, say, a spouse or a child or somebody else to let them use this car. That's what this is akin to. There's no rental agreement. The undisputed evidence is the keys are basically there. Yeah, with Mr. Lyons. I mean, but your client is Mr. Imons, right? He is. And yet the testimony, the unrebutted testimony, Your Honor, is that the courtesy vehicle is there for pilot, passenger, and crew. And there's no distinction among the three groups about who has superior rights versus one and another. So I don't see how under Carlisle or under what society would say we're reasonably expecting once we get in a vehicle that a person who is a passenger suddenly has a dissipation of any expectation of privacy because they are a passenger. Where are we going to draw the lines for who's in the car and what rights they have? It's basically because they are in the vehicle, and that's the case here, both the plane and the courtesy car. So let's move for a minute. Why, as soon as Mr. Imon concedes that he's got personal use amounts of marijuana in the car, why isn't that the end of the game for him? Because of what occurred before makes that determination, that finding. So you went on that only if there's a problem that went on before. Right. But there you have to deal, don't you, with all of the surveillance that the DHS people had been doing of this airplane back and forth around the country? Glad you used the word surveillance because that's what they said you should be doing. They don't say interdict. They don't say arrest. They don't say performatory stop. And so if we were to look at what the officers knew who were there in Litchfield, they knew nothing more at the time when they made the decision to interdict than what the person from the AMOC, well, I may use that as an abbreviation. AMOC. Yes. The Air Marine Operations Center. Yes. So Air Marine Operations Center said that the pilot, the plane, and the passenger are non-suspect. And then it goes to Agent Spencer, who says conduct surveillance. If we're to have collective knowledge, this is all the knowledge that's been collected, and it doesn't tell anybody who's there in Litchfield to go ahead and perform an arrest or to make a Terry stop. Yet that's what they do exactly. Well, so they list on pages 7 and 8 of their brief the things that caught the attention, I'll just say, of the law enforcement officers, the center. The suspicious box. The box, yes. Through or near, they say, because I guess there's some testimony that it wasn't through the serious storm. And they use these little bitty airports like Litchfield that nobody's going to be watching them. So if you use one airport, that means that you are now suspect. Well, taken in the totality, as they all say. This airplane's flying a pretty long distance from California to Allegheny County, Pennsylvania, and back again. It would be an exceedingly poor rule if now people in rural communities are under heightened suspicion by virtue of where they live because folks in Chicago, where there's probably a lot more drug use and transit through airports, are non-suspect. Your Honor, I don't think that's supported by the evidence. Well, that's not what I said either. I said taken together. Your Honor, I'm not trying to put words in your mouth. I'm saying that this can be the natural consequence of trying to determine between rural. The government study shows that self-service gas at these closed airports is about 40 cents a gallon cheaper. Your Honor, I don't think that it's fair to call that a study, but there was some. Okay. That's the GATA. That's to pull out another acronym here. A non-peer-reviewed item prepared by law enforcement that's never been tested in any fashion. That's exactly what they said. And if you look at what it is, it does not look like much of a compilation based on anything other than people's suspicions that are in some way considered valid by the folks who wrote them. Okay. Can I ask you, Mr. Hillis, have Mr. Iman and Mr. Lyons, are they serving, have they served prison portions of their sentence at this point? Mr. Iman is still in FCI Taft. He has not been released. He's still in custody. And Mr. Iman is in custody. And Mr. Lyons is as well. Both men are in custody. Both now in custody. Yes. And even if they're to be released, Your Honor, we would have the matter of their conviction, which would be contesting. Of course. So if I may turn then to why we believe that there's an arrest, we think that the factors that are established in this court's jurisprudence under Orestowski strongly support finding an arrest here with the en masse presence of law enforcement. Never mind, of course, that collective knowledge and anything else that we are going to talk about earlier being limited surveillance. They come out. They are armed. They are in body armor. Their weapons are visible. They've got multiple police cars. Lights are on. Documents are taken. Money is taken. They are surrounded. They are not allowed to go to the hotel where they're supposed to be staying. They have no place to retreat to. These are all strong factors under Howe's and other cases, not only from the Supreme Court but from this court, like Orestowski, that tilt this very definitely to an arrest. Were we not to have an arrest? Are we to place any weight in the government's comment that there was only one parking place left in the hotel lot so they had to pin in the car? No, because as we pointed out in the reply brief, Your Honor, the fact that there's one spot left doesn't greenlight the government to come in and surround you and keep you in. So they should have been allowed to leave regardless of the number of spots. They've positioned their cars purposefully to avoid the suspects from now departing. That communicates to a reasonable person they're under arrest and not free to leave. That's, again, an indicia of arrest. And so the government might want to say we did these things because they came at night, so nighttime's not a factor. But it's an objective factor. Same thing with surrounding a person. It doesn't matter how many parking spots there are. If you have impeded somebody's ability to leave, then that demonstrates custody. And it's as simple as that. Time of day, same thing. To say nothing how that undercuts the government's argument. If they say these people were going to go in a hotel room, so there's nothing to fear here about this. Maybe a quick word about inevitable discovery. The government argues that they followed them to the hotel because they were curious about them, but that they were going to go back anyway with the dog to the plane. Can't. Can't rely on inevitable discovery when the evidence here at suppression transcript page 329, if I recall correctly, is from the chief of police, under whose control the dog is. The canine handler works for the chief. The dog is a part of his forces, if you will, that he can deploy. And he says nowhere that he would absolutely have deployed the dog. It depended on what happened in the parking lot first. So they cannot show a course of events, an independent course of events, that would have led to the absolute deployment of the dog at the airport. So they cannot make inevitable discovery work. This is to say nothing about the reliability problems. So if you bring this dog that is unreliable because it actively alerts and it passively alerts. When a dog does those two things, there's no third option. So what is it about the dog's conduct that shows that what it is doing actively or passively demonstrates the reliability necessary for probable cause to allow under Harris the use of that dog? So I think, Your Honor, you can pick between those two things that are both just they're taking away from the government's rationale based on the facts that are in this record. If you were to say that Aerie is reliable, and we take great issue with that under the Simpson case from the Tenth Circuit, under Bentley from this circuit. But if you were to say the dog's reliable, you still have this problem with the testimony of the chief. And there is nobody who is there who has a dog other than the chief. And so they cannot show the inevitable discovery. When was the dog called? Aerie. No, no, no, no. That's me. Oh, I'm sorry. At what time? When was it ordered to the scene? About 15 minutes into the stop. At the hospital? At the hotel, right? In the hotel parking lot. Thank you. Yes, Your Honor. All right. Thank you very much, Mr. Coates. Thank you. Mr. Morris? May it please the Court, the most credible witness as to whether there was an arrest immediately when these eight officers and six cars and flashing lights showed up at this parking lot is Chief Wilkinson, who testified in the state court that they were arrested. He was asked, was Mr. Eyman arrested at that point? He was in custody, yes, sir. Didn't he change his testimony later, though, at the federal hearing? He did. And three times in our brief, we alluded to the fact that the testimony had shifted, because when he gets to federal court, he has very different testimonies. He says, oh, well, I actually meant an investigative stop. It was brief. But his testimony in the state court was sufficient. Was his testimony that he didn't understand at the state hearing the difference between a Terry stop and an arrest? No. There was never any direct comment. The state's attorney didn't even try to argue that they weren't in custody from the beginning. And the state judge said the former Litchfield police chief conceded the defendants were under arrest at their car in the hotel parking lot, surrounded by federal and local law enforcement officials. They were arrested from the beginning. Even if Mr. Lyons wasn't arrested at the beginning, he was improperly arrested without probable cause after Mr. Eyman says, yeah, I've got a small amount of pot in my backpack. And that allows me to say that mere propinquity to another defendant is not a reason to arrest everyone. And the district court relies only on one case. And that case is clearly distinguishable. And we do that in our brief. It was Maryland versus Pringle. And it's very different. And I won't take my very limited time to say why. The third point I wanted to touch on is that Mr. Lyons was frisked. And in the course of that frisk, the officer finds cash and touches it and asks him what it is. And I think that's all okay because a Terry frisk must only be with respect to whether there are weapons and whether there's a danger to the officers. But then what's undisputed is that this Terry frisk is then followed by them taking that money from him. And it's later used by the district judge to say, oh, this is a fact on why he should have been arrested. He has $2,600 in cash. His answer is, I had it. And he said this at the time, it's for repairs and for gasoline. But didn't he say it was $1,600 instead of $2,600? That all comes because it was improperly seized. All of that would never have been heard and shouldn't be the basis for determining probable cause because ‑‑ So your position is the police can take out only something that might potentially be a weapon, you know, a knife, a gun? I think that's actually ‑‑ I hate the term black letter law, but Minnesota v. Dickerson says, if the Terry protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid and its fruits will be suppressed. I think of all the issues in this case, that one is how we should win on. And it's important because the judge really doesn't have much of an argument, respectfully to the district judge, to find probable cause. Iman's admission he's got the small amount in his backpack, which is verified, just simply doesn't suggest ‑‑ Doesn't bring in Mr. Lyons. I don't think so. And then the judge has three other things she mentions, that he became faint when this massive SWAT team like pounce comes upon him. I'd be faint, too. And secondly, that there's this mysterious box which never even gets to inventory and seems irrelevant to me as to whether or not ‑‑ That's with the coffee maker in it, yeah. Yeah, I mean, that one's sort of silly. And even when Agent Harrington talks about it. They took the coffee maker and left the dope on the plane. Except for what was in the backpack. So the only justifications other than Iman's arrest for arresting Mr. Lyons, and this is important because he would be free to go, are his faintness, the box, and the cash. And the cash should never have been considered by the court. It was improperly obtained. What really happened here is that they had a reason to surveil, to watch, that we concede that. That's all I knew was some unusual flight patterns. And they went and arrested him at the parking lot.  Thank you. Thank you. Mr. Yans. Good morning, Your Honors, and may it please the court, counsel. My name is Victor Yans, and I represent the United States. I'd like to first start with an item that Mr. Hill has raised with regard to inevitable discovery. Because I do think this is a very important argument for the government. And I think it's important for the court to understand the excerpt of the testimony to which counsel referred. First of all, it's clear to everybody that this is a federal investigation run by federal agents with the assistance of state law enforcement personnel. The very first act that the federal agent did when he received this tip hours before the plane touched down was to arrange for the availability of a canine. So this was a federal investigation from the start, and state personnel were there for assistance. It was the unrebutted testimony of each of the federal agents that, without a doubt, as soon as those defendants left the airport in the courtesy car, at some point they would go back to that aircraft and deploy the canine around the aircraft. The aircraft was left unattended? The aircraft was left unattended. There were how many agents and officers involved? Surveillance-wise, Your Honor, there were two federal agents and there were three state officers. And they made the operational decision, which needed to be made in the moment, to take these five law enforcement personnel and follow the two defendants because they just saw them unload something from an aircraft that they reasonably suspected was being used to traffic drugs or some other contraband. Let's talk about reasonable suspicion at some point here, but okay. Yes, Your Honor. And whether this was an arrest. And also chain of custody. So this airplane is sitting there all by itself for some length of time. The aircraft is by itself for— And nobody's watching it, so we don't know if anybody put the marijuana in later as a handoff or anything. That's correct, Your Honor, although it is notable that the police had to use keys to open up the aircraft, and those keys were taken from defendant Lyons. But with regard to the testimony from the Litchfield chief of police as to whether or not he would have, without a doubt, deployed that canine, number one, that wasn't his call to make because this was a federal investigation. But more importantly, number two, that came in response to a specific question in the special— So wait a minute. Are you telling me the feds would have ordered him to use the dog? Well, of course, Your Honor, there's a cooperative effort between the state and federal authorities, and I'm not suggesting that he could have— You don't want to get too close to the state prosecution here, do you? Well, Your Honor, at least with regard to the canine, the chief of police of Litchfield answered a direct question, if the federal agents declined to deploy the canine around the aircraft, would you still have done it? And his response to that was, well, I don't know because there must have been some intervening factor or some other event or some consideration for those federal agents not to deploy the canine on the aircraft. And so, therefore, I would have to consider whatever other factor was in play. So that's not a yes. I mean, it's a I don't know. It's not a yes, but it assumes that he would have deployed the canine, but for some general vague intervening event that would have caused the federal agents not to do so. With regard to— That's not the strongest, but anyway. With regard to the reasonable suspicion, there is a host of articulable facts that were conveyed to these agents and law enforcement through AMOC, an agency with which these agents and officers had prior experience and knew them to be reliable or at least provide reliable tips. And the tip included the fact that twice in the past two months, this aircraft had made long-distance, quick-turn flights between California and Pennsylvania. It was identified as a single-engine Cessna aircraft, which is relevant because this isn't a jet plane that can make that flight in a matter of hours. In fact, the evidence bore out that each flight took a minimum of 12 hours, one leg. And that's time in the air. That excludes taxiing, runways, and refueling, et cetera. And so it makes these quick turns at the destination even more relevant. As Chief Judge Wood noted, they were in the practice of using these small, rural airports. And at times— Although Judge Hamilton pointed out the gas is cheaper there. And that's certainly— Why not save some money? As the government's own resources point out. And the AMOC advice was simply be on the lookout, right? The AMOC advice was simply be on the lookout because the underlying assumption with all of this was that this plane was going to touch down in Litchfield, refuel, and then continue on to its destination, which would have been consistent with prior travel patterns. That underscores even more the inevitable discovery argument because even though that was the underlying assumption, that there likely would not be an encounter with these defendants because they likely would never leave the airport, the agents still made available the canine in the very specific but unlikely scenario that the defendants stayed in Litchfield for the night. And as soon as they powered down the plane and left the airport, it was inevitable that at some point later the canine would return to the— The dog, yeah. So it's kind of an inverted story because you have the plane leaving an area of California known for its lush marijuana fields, going to Pennsylvania, and then coming back with marijuana from Pennsylvania. Sounds like Coles to Newcastle. I don't—It's a funny theory. Well, Your Honor— I don't know why all that marijuana was in the plane. To be clear, the reference in the AMOC tip with regard to areas of California known to be prominent in drug trafficking, that was not in the specific area that the plane had departed from but rather there had been some activity with that aircraft in those areas in the recent past. So it just weakens the link, though, doesn't it? And certainly the court is free to place whatever degree of weight on that specific component of it. But again, what we're talking about is the totality of the circumstances, and what we're talking about is a very low threshold of establishing reasonable suspicion that there is— Well, what you need to focus on is the difference between grounds to be on the lookout and grounds to restrain people's liberty, freedom of movement under threat of force, right? That's what a Terry stop authorizes. Certainly, Your Honor. And that's where it looks, frankly, to me as if the officers on the scene jumped the gun here by conducting what certainly looks to me like an arrest, a custodial arrest in a hotel parking lot. Well, Your Honor, with regard to the standard for being on the lookout, there is no standard. So really all we're talking about is the standard, does it rise to reasonable suspicion to effect a Terry stop? And given the two quick turn flights in the prior two months— Does the government have any evidence about how law-abiding pilots use their planes for long trips like this? Not in the record, Your Honor, but— No, and the GATA analysis here looks like some of these old drug courier profiles, travels alone, travels in pairs, travels in groups. That is, stops at remote closed airports to refuel, stops at open airports and refuels in the open. It doesn't provide any individualized grounds for suspicion that I see. I understand why they would have said, well, it's an odd pattern, let's keep an eye on this. But I don't see grounds for restraining liberty. Well, the one individualized factor that was present in this case was that the pilot of this aircraft, Defendant Lyons, had recently exited bankruptcy. And although— And that's— Perfectly legal. It's perfectly legal, but it's part of the analysis, Your Honor. And it— And also the— So the so-called bankruptcies have been running, I don't know exactly which year this was, but they were running about a million a year altogether, including all types, personal and business. They're down to about $750,000 a year. So that's pretty inclusive. His bankruptcy ended in 2012, right? In 2012. Back when they were a million a year. Pretty bad times. Well, and certainly— And AMOC reported plane owner and pilot are non-suspect. He notes the flight through bad weather and also notes that Mr. Lyons is medically qualified and an instrument-rated pilot, right? Correct. And again, the practice, the continuous practice of using these small rural airports at times when these airports are effectively closed suggests to a reasonable person that this pilot or these travelers are attempting to limit their interactions with others. Again, the navigation through a storm, an apparent storm— Which was mistaken, right? Well, it wasn't a mistake, Your Honor, but it was something that the district court didn't rely on because there was questions to the veracity of that assertion, but certainly the officers relied on that in good faith. And what are the reasons a pilot gets instrument rating? Well, to navigate his way through— At night and in bad weather, right? Certainly, certainly. But it also—even the most qualified pilot is assuming some additional degree of risk, however slight it may be, depending on the weather. And if a pilot is electing to fly through a storm as opposed to landing and riding out the weather, it might suggest that the pilot is unwilling or not wanting to put himself in a position where he's interacting with travelers. That's very speculative if you listen to yourself. Well, and again, Your Honor, this is one of the many factors that go into the totality of the— But if we knock them all out, then you wind up with zero plus zero equals zero, you know. You only have a totality if some of them come in as deserving of certain weight. Well, and it's important to point out, too, that the air— I know all sorts of people in the wide-open spaces, parts of our country, who have pilot's licenses, and they like to fly because it's fun, and they probably don't adhere to the same 24-hour day that the rest of us do. And that may well be, and again, that's fair for the court to consider. But again, the flight in question, incoming to Litchfield, was following the same pattern as well. It was a small rural airport. It was after midnight at a time when the airport was effectively closed. They were not going to be interacting with any authorities there, any fellow passengers. The airport was essentially blacked out and empty as— But to do this self-service gas, you have to use a credit card, don't you? You do have to use a credit card. So you've got to leave a paper record behind. That's correct. Was there any indication—and there are indications of efforts to make stealthier flights. Was there any indication here—we see in the case law, for example, pilot turns off the transponder. Did that happen here? No, Your Honor. Did he follow his flight plans? I don't believe the record suggests he deviated from flight plans in any way. So he wasn't—the pilot certainly wasn't making overt acts to avoid detection with regard to his flight records and when he would be going to which airports. Those are the kinds of things I'd say, yeah, stop him. Talk to him. Absolutely. And the district court also noted that when the surveillance officers were observing these defendants disembarking from the aircraft, unloading their cargo and loading it into the courtesy car, that it did include this box, which, again, in and of itself is totally innocuous, but it was also inconsistent with personal luggage or luggage that someone might take with them for an— I don't understand that. If you're in your own car or airplane, if you just toss in a bag or a box, you don't have to worry about packing it up so that it'll survive the baggage handlers. And, again, Your Honor, that may well be, and it's a very—this is one of the many factors that go into the low— again, the low threshold of reasonable suspicion. Of the box? The theory was that you'd pack drugs in a box rather than the duffel bags in suitcases and briefcases we see in zillions of cases. And it doesn't necessarily speak to the fact that that box was carrying drugs. It just speaks to the fact that— Because it wasn't, actually. And it just speaks to the fact that perhaps these defendants were up to something other than a standard overnight at a hotel. And that's the only probative relevance of the box, but it's something, and it's there. And, again, this is a totality analysis, and so that's how— So could we go back to the question of whether a reasonable person in Lyons and Imon's position in the hotel parking lot would have felt free to walk away or choose not to talk to the police? Certainly. Well, the district court did make several factual findings with regard to whether or not there was an arrest in the parking lot. The fact that the duration of the questioning was very short. The fact that there were no physical restraints. What about the free-to-leave element, which is what Judge Hamilton just asked you about? Well, there is— They're not free to leave. They're pinned in by the car, and if they had said, we're going to walk out onto the highway and just walk into town and call an Uber, assuming they have Uber in Litchfield, I can't believe the police would have let them do that.  So you agree with that. They were not free to leave. Well, the testimony of Agent Mitchell, who was the one who encountered Defendant Lyons, was that they were free to leave. He wasn't blocking his path. How did he indicate that? Well, first of all, where the officers had parked their vehicles, I take your point, Your Honor, that the fact that there were no parking spaces left doesn't necessitate that they park 8 to 10 feet behind the car, which is where they did park. But the car pinned in. I mean, the car's not going anywhere, right? But at the same time, Your Honor, these defendants had exited the vehicle and were walking toward the hotel before they even knew law enforcement were there. So to the extent that they couldn't drive away in their vehicle, they had expressed no intent to do so. Well, a person isn't free to leave a Terry stop and does not reasonably believe that he or she is free to leave a Terry stop. That's not a dispositive factor. That's not the legal test for the distinction between an arrest and a Terry stop. Both are seizures. It's a sliding scale. There is an inherent restriction on the freedom of movement with regard to any stop, whether it be a Terry stop or an arrest. And as Judge Sykes notes, that is not the end all be all. Right. The test is whether a reasonable person would believe that this is an arrest, what the law would recognize as an arrest. The officer's subjective beliefs are irrelevant, so what the chief of police, the local chief, said in the state court hearing is irrelevant. Unless it was communicated. If he had been on the scene and said you're under arrest, then it would be an important factor. It should carry the same weight, Your Honor, as the government's witnesses who testified that they were not under arrest. Could you address, counsel, which you did not in your brief, the change in testimony? I frankly am really troubled by that, given the history of this case. And I can't imagine that a police chief and senior lieutenant didn't know the difference. Well, Your Honor, unfortunately, as counsel noted, the record is not developed enough to determine at the suppression hearing the nature of his prior testimony and whether there was a misunderstanding of the law. I mean, I take your point that we hope that all of our law enforcement officers know the difference between a Terry stop, an arrest, a temporary detention. Did the chief explain his change in testimony? He did not. And I would just point to the same point that Judge Sykes made, which is really it's not his call to make. This is an objective standard, not a subjective one. But he's an objective observer. He certainly could comment. He plans the circumstances. It appeared to me that he was free to leave, or it appeared to me he was detained but only temporarily, or it appeared to me, you know, objective findings have to be made from data on the ground. And he's an objective observer just the same way. He changed his story. And his testimony, again, should carry the same weight as the other witnesses  So you should pay no attention to what the government agent said either, in your view, since you don't want us to pay any attention to the police. That's my point, Your Honor, is it could be probative of something, but it's Why isn't just the position of the cars, the physical layout of the parking lot, the behavior, the duration, you know, the lines winds up in the car after the fainting episode. We all know that you gave him some water. That was fine. But those are the objective facts. That's correct, Your Honor. As are the fact that no officer drew their weapon, issued any commands, even raised their voice. The duration of the questioning was very, very short. And it was the majority of that questioning was related to this medical episode that defendant Iman had. And so, again, given the totality of the circumstances, it was not an arrest at that point. It's Lyons who had the medical episode. Thank you, Your Honor. I apologize. Thank you. All right. Well, I think we need to leave it at that, and we appreciate your presentation. Thank you. And we've gone over on this side. I'm not sure, Mr. Hillis or Mr. Morris, if somebody has rebuttal. But we can give them two minutes to balance this out. Appreciate the extra time, Your Honor. For the inevitable discovery, it's not the federal agent's dog. It's a Litchfield police officer's department's dog, rather, under the chief's control, his dog, his call. It's as simple as that. Unless the testimony was unequivocal that the dog would be deployed and it's not here, then I don't think that they can meet their burden under the not-to-be-lightly-invoked exception to the Fourth Amendment warrant requirement. That's what we say of these things like inevitable discovery. They are lightly invoking it here. They say there was no likely encounter if the men stayed at the airport. That seems to be counter to the narrative that we heard elsewhere that the police had to come in and would always search because of the potential presence of drugs. So I think that undercuts the claim that law enforcement would always have made contact, which is one of our contentions here anyway. I misspoke when I said that the AMOC official said that there was a passenger in the list of people that he said was non-suspect, the plane, the owner, the pilot. He said nothing of the passenger. I think that actually helps us. There's no mention of a passenger who's under any sort of suspicion. That would be Mr. Hyman. The government does a fine effort in taking individual factors from cases to say this doesn't indicate a stop or an arrest and pieces these things together. But if we look at cases like Borastowski that actually look at the totality of circumstances or Sprosty versus Bookler, we find a lot of similarities here that definitely tilt this into the direction of an arrest. And I think that that's important to look at a case that considers truly the totality of the circumstances or how is a case like that. The testimony, while it may have changed from Chief Wilkinson, Lieutenant Jarman said the men were always under arrest. And also, you don't have to draw a gun to show that you're under arrest. A visibly armed law enforcement officer communicates a great deal, and there's no contest here. These officers were visibly armed. That and nothing else. All right. Well, thank you very much. And we thank you, Mr. Morris, for accepting the appeal. Can I have one minute? I didn't get any rebuttal in like three minutes. Oh, well, yeah, we went actually close to four minutes over with Mr. Yan. So you can have a minute. Thank you. Only to direct the Court's attention to three places in our brief where we talk about this changed testimony. Page 6, we said, Wilkinson reversed his state suppression hearing testimony concerning when Eyman and Lyons were arrested. Page 9 to 10, the government should not have been allowed a do-over at which the same witnesses offered altered testimony that conveniently improved the government's case. And at page 16, we said, in discussing collateral estoppel, that to have a second hearing allows the government to alter problematic testimony to improve its case, which is precisely what happened here. My point is that the government's brief does not in any way respond to those three separate direct statements about altered testimony by the person who was present observing the circumstances at that airport. Isn't that just a subject of impeachment as opposed to a reason to reverse? I think it's a waiver. I think not to respond to that in our brief waives their objection to it. They've never taken the position, and nor did I, with all respect to my opponent, nor did he do it here, that that was false testimony. He's never quarreled with it, that it's accurate. That's all I want to say. All right, well, thank you. And as I was starting to say, Mr. Morris, I believe you took this case by appointment. We appreciate your efforts on behalf of your client. Mr. Hillis, we always appreciate the efforts of your office in these cases, and thanks, of course, also to the government. We will take this case under advisement.